UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA A. MILLER, ) | |
| ) | |
| Plaintiff, ) | No. 1:18-cv-04738 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| THE FRENCH PASTRY SCHOOL LLC and ) | |
| THE BUTTER BOOK LLC, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

This case demonstrates how a failure to hammer out the legal details of a business relationship in advance is a recipe for a lawsuit. Based on the murky dealings, Laura Miller brought this copyright-infringement lawsuit against The French Pastry School, LLC and The Butter Book, LLC (for convenience's sake, this Opinion will refer to the Defendants collectively as Butter Book).[1] Miller asserts both federal and state law claims arising out of Butter Book's use of Miller's allegedly proprietary literary works, which Miller had originally provided to Butter Book. In turn, Butter Book has levelled counterclaims against Miller, challenging Miller's ownership of the works. The parties now cross-move for summary judgment. For the reasons discussed in this Opinion, Miller's motion is denied and Butter Book's motion is granted in part and denied in part.

---

[1]This Court has subject matter jurisdiction over the case via federal-question jurisdiction, 28 U.S.C. § 1331, as well as supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Citations to the docket are indicated by "R." followed by the docket entry.

## I. Background

In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So, when the Court evaluates Butter Book's motion, Miller gets the benefit of reasonable inferences; conversely, when evaluating Miller's cross-motion, the Court gives Butter Book the benefit of the doubt.

### A. Miller-Butter Book Relationship

The French Pastry School is a Chicago-based culinary school offering classes in pastry, baking, and the confectionary arts. DSOF ¶ 7.[2] It founded the Butter Book in 2015 to provide guidance and resources to confectionary arts enthusiasts through an online website with various course descriptions, demonstration videos, employee biographies, and articles. *Id.* ¶¶ 10–19.

In 2016, Butter Book entered into an agreement with Miller to prepare content for the website. DSOF ¶ 27. As part of the agreement, the parties signed a Confidentiality Agreement under which Miller was to return "[i]mmediately upon request" all confidential information to Butter Book and remove any digitally stored confidential information from any storage devices in her possession or control. *Id.* ¶ 32; R. 222-12,

---

[2]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for Butter Book's (Defendants') Statement of Undisputed Facts (R. 221); "PSOAF" for Miller's (Plaintiff's) Statement of Additional Facts (R. 233); "PSOF" for Miller's Statement of Undisputed Facts (R. 234); "Pl.'s Resp. DSOF" for Miller's Response to the DSOF (R. 233); and "Defs.' Resp. PSOF" for Butter Book's response to Miller's Statement of Additional and Undisputed Facts (R. 253).

Defs.' Exh. 11, Confidentiality Agreement ¶ 2. The parties dispute whether, under the agreement, Miller would begin by independently writing—or instead merely editing—a set of sample glossary terms for Butter Book. Pl.'s Resp. DSOF ¶ 31; Defs.' Resp. PSOF ¶¶ 8–9. Miller contends that she provided the "voice" for Butter Book's ideas and any edits that Butter Book gave to her were just technical in nature. PSOF ¶¶ 11–21. Butter Book denies this contention and instead asserts they gave Miller more thorough feedback and supervision throughout the project. Defs.' Resp. PSOF ¶¶ 8, 17, 20, 23, 34. In any event, Butter Book paid Miller for her work product. DSOF ¶ 37.

In August 2016, the parties agreed to additional contract terms in which Miller would work on additional content for the website. DSOF ¶¶ 38–39. The new projects assigned to Miller included a new glossary of terms, "learn pages" (that is, food-science instructional pages), course and series descriptions, employee biographies, and blog entries (collectively designated as the "Works"). DSOF ¶¶ 40, 42–52. The parties dispute whether Miller independently completed these Works. Defs.' Resp. PSOF ¶¶ 8, 9, 66, 67.

The parties also dispute how the Works related—if at all—to Miller's future employment with Butter Book. For example, Miller alleges that she agreed to the rate of $15.00 per glossary term because Butter Book had told her that the company was considering her for a long-term position that would provide her with "financial freedom." Pl.'s Resp. DSOF ¶¶ 39, 40. She argues that she was designated by Butter Book as "Lead Writer and Editor" during the duration and the future of the project. PSOF

3

¶¶ 50–55. In contrast, Butter Book asserts that it never offered or promised Miller employment. DSOF ¶ 69. The company argues that Miller's understanding of her employment status was premised solely "on statements by Defendants' representatives asking for Miller to deliver samples of her work to Defendants, and if Defendants' liked the samples, Defendants would give Miller more work." DSOF ¶ 61. The defense says that, to the extent that Miller was identified as the lead writer and editor, she was in fact not the lead writer and editor *during* her completion of the Works, and any correspondence discussing the title actually was just "set[ting] the parameters for what *future* post-launch roles hoped to be." Defs.' Resp. PSOF ¶ 50 (emphasis added).

As Miller continued to work, from October 2016 to February 2018, Butter Book paid Miller $45,166.45. DSOF ¶ 56. In February 2018, Butter Book informed Miller that it would pay her an additional $7,000. *Id.* ¶ 83. But the parties dispute the reason for this payment. For its part, Butter Book contends that this payment was made in response to an email from Miller, sent back in November 2017, in which she asked to renegotiate her compensation. *Id.* ¶¶ 79, 83. In contrast, Miller argues that Butter Book paid the $7,000 as "back pay." Pl.'s Resp. DSOF ¶ 83.

Moving forward two more months, on April 20, 2018, Butter Book requested that Miller turn over all of the Works they had sent her, as well as all of the edits that she had completed or was in the process of completing. DSOF ¶ 85; Pl.'s Resp. DSOF ¶ 85. Miller did not do so. Instead, she eventually sent Butter Book copyright license agreements to cover her edits. PSOF¶ 4; Pl.'s Resp. DSOF ¶ 85. But Butter

4

Book refused to sign the agreements, DSOF ¶ 92, so Miller filed applications for registration of copyrights with the U.S. Copyright Office for the disputed edits. PSOF ¶¶ 5, 68–72. On July 5, 2018, Miller offered to provide Butter Book with the Works if Butter Book agreed that Miller owns the Works, or at least agreed not to reproduce, distribute, publicly display, or otherwise use the Works edited by Miller. PSOF ¶ 7; Defs.' Resp. PSOF ¶ 7. Butter Book refused the proposal. PSOF ¶ 7.

### B. Procedural Background

With those facts (and disputed facts) as the backdrop, the litigation too reflects the contentious relationship between the parties. As pertinent for the here and now, Miller eventually filed a Third Amended Complaint against the Defendants, seeking declarations that (1) Miller owns copyrights to the Works; (2) Miller did not grant an implied license to the Defendants to use the Works; and (3) unauthorized use by the Defendants of the Works constitutes copyright infringement. R. 179, Third Am. Compl. ¶ 4. Miller further asserted claims for fraudulent inducement, fraudulent concealment, and promissory estoppel under Illinois law. *Id.* ¶ 5. The Defendants responded with counterclaims, alleging breach of contract, breach of a confidentiality agreement, copyright ownership over the Works, conversion, and a request for a declaration that the Defendants own an implied license to use the disputed Works. R. 141, Defs.' Am. Counterclaim.

Both parties now cross-move for summary judgment on the implied license and copyright infringement claims. Miller moves for summary judgment on copyright

5

ownership and Butter Book moves for summary judgment against Miller's fraudulent inducement, fraudulent concealment, and promissory estoppel claims.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Implied License (Count 2 and Counterclaim 5)

Both parties move for summary judgment on Butter Book's counterclaim that Miller granted Butter Book an implied license to use her Works. The counterclaim's converse is Miller's Count 2, which seeks a declaration that there is no such implied license. Butter Book argues it has an implied license to copy, display, and distribute the Works, R. 220, Defs.' Br. at 5. Conversely, Miller contends that no reasonable jury could conclude that Miller provided an implied license to Butter Book, and that the counterclaim is "premature" to the extent that it seeks an implied-license declaration for "interim" drafts. R. 232, Pl.'s Br. 5–7. The motion is denied on both sides, because whether Miller granted an implied license to Butter Book is a genuinely disputed question of fact.

"An accused infringer can avoid liability for copyright infringement if he or she can prove the existence of an implied non-exclusive license to make use of copyrighted material." *Kay Bros. Enters. V. Parente,* 2018 WL 3630155 at \*22 (N.D. Ill. July 31, 2018) (citing *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016)). An implied non-exclusive license is granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute this work." *I.A.E. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996). "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license." *Kay Bros. Enterprises, Inc.*

2018 WL 3630155, at *8 (cleaned up).³ "And the relevant intent is the licensor's objective intent at the time of the creation and delivery of the work." *Id.* (cleaned up).

An implied license is an affirmative defense to copyright infringement, so Butter Book bears the burden of proof on it. *See Muhammad-Ali*, 832 F. 2d at 761. As a threshold matter, Miller argues Butter Book's motion for summary judgment on their implied license counterclaim is premature because it was pled in the alternative. Pl.'s Br. at 5. Miller cites two district court cases, *id.* (citing *Broussard v. TMR Co.*, 2013 WL 5516462, at *7 (W.D. La. Oct. 1, 2013); *West Linn Paper Co. v. Alberta-Pacific Forest Indus., Inc.*, 2018 WL 5116062, at *5 (D. Ore. Oct. 19, 2018)), but Butter Book correctly points out that both cases are starkly different from this case, *see* R. 254, Am. Defs.' Reply at 5. Neither *Broussard* nor *West Linn Paper* involve copyright claims or implied-license defenses. In *Broussard*, an environmental contamination/remediation case, the Court held that, at the summary judgment stage, it was too early to decide comparative fault and reduction of damages because there were several other defendants that might have contributed to liability. *Broussard,* 2013 WL 5516462 at *4, *6. In *West Linn Paper*, the Court determined genuine disputes of material fact needed to be resolved before a counterclaim for reclamation or stoppage could be granted. *West Linn Paper Co.*, 2018 WL 5116062 at *5. So those two cases simply stand for the proposition that *sometimes* an alternatively pleaded claim will

---

³This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

8

not be ready for a decision at the summary judgment stage. But that is not the case here. Here, if indeed Butter Book has an implied license to the Works, then the copyright dispute would be over and there would be no need to decide whether Miller owns the copyright in the Works. Alternative claims (or defenses) can render primary claims (or defenses) moot, so there is nothing "premature" about deciding alternatively pleaded claims before primary ones. (As it turns out, neither side wins summary judgment on the implied-license defense anyway.)

Miller also contends that deciding Butter Book's implied-license defense now (presumably in Butter Book's favor) would "result in severe unfairness to [her]," because she has expended time and resources on litigating her copyright-ownership claim. Pl.'s Br. at 5. Again, sometimes that is just the way the litigation ball bounces, but there is no general requirement to decide claims before defenses. It is not as if, for example, a plaintiff can demand that a court decide whether there has been a breach of contract when a statute of limitations defense would defeat the contract claim anyway. Again, as it turns out, Butter Book's summary judgment motion on the implied-license defense is not a winner, but the Court will not simply skip deciding it.

Moving to the substance of the implied-license defense, Butter Book argues that there is no genuine issue that Miller granted an implied nonexclusive license in the use of her Works. Defs.' Br. at 5–9. In support, Butter Book cites to *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996). In *I.A.E.*, an architect agreed to provide multiple drafts of schematic drawings to a construction company for $10,000 under the

9

assumption that he would remain staffed on the project. *Id.* at 771. When the architect realized that he would no longer be involved in the project, he tried to take ownership of the work by writing, "We trust that our ideas and knowledge exhibited in our work will assist [the company] in realizing a credible and flexible use … facility". *Id.* The Seventh Circuit rejected the architect's too-late attempt to assert rights in the drawings. *Id.* In particular, *I.A.E.* relied on the architect's written permission for the company to use his works and the payment of $10,000 …." *Id.* at 775 n.10, 776–77.

It is true that there are some similarities between this case and *I.A.E.* Like the architect in *I.A.E.*, Miller sent several drafts of her Works to Butter Book and was paid for her efforts. DSOF ¶ 37. Also, as in *I.A.E.*, Miller sent the Works to Butter Book without warning Butter Book—until *after* Butter Book requested the entirety of her works in April 2018—that unauthorized use would infringe her copyrights. *Id.* ¶ 86. Unlike *I.A.E.*, however, Miller did propose (in April and June 2018) copyright licensing agreements for the Works, PSOF ¶ 4, before the parties hammered out any specific ownership or licensing arrangement. Also, unlike in *I.A.E.*, Miller applied for and received U.S. copyright registrations for the Works. *Id.* ¶ 5. In fact, she did not sign the Content Provider Agreement proposed by Butter Book; instead, Miller counter-offered with her own licensing proposal. *Id.* ¶¶ 6–7. Miller's refusal to provide the final version of the Works also adds to the dispute over whether an implied license existed, and if so, what Works it covered.

Indeed, there is even a genuine dispute over whether Miller actually delivered the Works to Butter Book. Butter Book alleges that the final Works comprise the drafts that Miller submitted. Defs.' Am. Reply at 2. But Butter Book does not point to examples in the record or comparisons between the work product it received and what Miller asserts are the final copyrighted works. With this gap in evidence, a reasonable jury could find against an implied license. For her part, Miller argues that materials in the record demonstrate drastic differences between the interim drafts and final work. R. 255, Pl.'s Reply 3. For support, Miller relies on (1) a 223-page chart comparing the interim and final glossary of terms; (2) a 22-page table comparing the interim and final "Food Lover's Glossary of Terms"; and (3) an eight-page chart comparing the interim and final course descriptions. *See* R. 235-1, 235-2, and 235-3, Miller Decl. Exhs. A–C. But these three exhibits are devoid of Bates numbers, authenticating evidence, or foundational citations. When the evidence is viewed in the light most favorable to Butter Book, a reasonable jury could find that there was an implied license. Consequently, *neither* party provides enough evidence on the delivery of the final Works, thus preventing the entry of summary judgment either for or against the implied license. *See I.A.E*, 74 F.3d at 776.

Miller also argues that, even if she provided an implied license to Butter Book at some point, she later revoked it when she sent Butter Book the proposed licensing agreements and filed this suit. But here too an important fact dispute prevents summary judgment in her favor. Pl.'s Br. at 7–8. It is true that, as a matter of Illinois contract law, a license might very well be revocable (that is, terminable) at will by

11

either side. *Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999) (holding that copyright licenses of indefinite duration can be terminated at any time by either party). The parties in *Walthal* entered into a written contract that had no specified term and did not identify the circumstances under which the contract would end. *Id.* at 482. The Seventh Circuit held that applying Illinois contract law would present no conflict with federal copyright law, so a copyright-license agreement could be terminated at will. *Id.* at 484.

But that does not answer the question in this case. Here, Butter Book contends that it *paid* for an implied license to use the Works *indefinitely*. *See* Defs.' Br. at 7. If this is true, the license might not be revocable. *See Myers v. Harold*, 279 F. Supp. 3d 778, 796 (N.D. Ill. 2017) (holding that "an implied license is irrevocable if there is consideration" for the license to be irrevocable). As noted earlier, however, the scope of the implied license—if there was a license at all—is not definitively proven by either side, making summary judgment inappropriate. *See Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1012 (N.D. Ill. 2000) (concluding that material issues of fact prevented summary judgment on whether the license to copyrighted photographs was of indefinite duration). In this case, a reasonable jury could go either way on whether the $45,000 in payments were for interim drafts or the final copyrighted Works. So too with the final $7,000 paid by Butter Book to Miller: viewed in the opposing parties' respective favor, either that money was additional consideration or just "back pay." Pl.'s Resp. DSOF ¶ 83. Neither side wins summary judgment on the implied license.

### B. Copyright Ownership (Count 1)

Next, Miller moves for summary judgment on her claim of ownership over the copyrighted material. Miller argues she is the sole author of the copyrighted Works because (1) Butter Book's contributions are not copyrightable; (2) Miller was the lead writer and editor of the Works; and (3) the text that Butter Book did provide was not original content. Pl.'s Br. at 18–22. Butter Book argues there are "factual issues rebutting Plaintiff's copyright ownership and validity." Defs.' Am. Reply at 7. That is right: summary judgment is denied on copyright ownership.

The Copyright Act provides that "[c]opyright protection subsists ... in original works of authorship fixed in any tangible medium of expression ... from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a).

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. For a joint work, the co-authors hold undivided interests in it, despite any differences in the authors' contributions. 17 U.S.C. § 201. "Each author … has the right to use or license the use of the work, subject to an accounting to the other co-authors for any profits." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994). Thus, even a contributor whose contribution is relatively minor enjoys full rights to the work if the author is truly a joint author. *Erickson*, 13 F.3d at 1068.

Miller argues that she is the sole author of the Works because any contributions made by Butter Book are not copyrightable. *See* Pl.'s Br. at 18–20. To Miller's thinking, she provided the "voice" for Butter Book's ideas and Butter Book only provided technical edits. Pl.'s Resp. DSOF ¶¶ 12, 30. Butter Book contends that it gave Miller language from its website and Miller relied on its videos to generate the Learn Pages (the online pages that teach food-science concepts). Defs.' Resp. PSOF ¶¶ 83, 86, 89. Again, there is a genuine dispute of material fact over whether Butter Book's contributions went beyond general "[i]deas, refinements, and suggestions" sufficient to pass the test of copyrightability. *Erickson*, 13 F.3d at 1072. If the evidence is viewed in Butter Book's favor, a reasonable jury could find that Butter Book was a joint author.

Miller also asserts that she was the lead editor and writer of the Works, which points toward her sole authorship. It is true that Miller has registered the Works with the Copyright Office, PSOF ¶¶ 68–72, which imbues the Works with a rebuttable presumption of validity. *Runstadler Studios, Inc. v. MCM Ltd. Partnership*, 768 F. Supp. 1292, 1294–95 (7th Cir. 1991). It is also correct that, contrary to Butter Book's arguments, Miller may be granted copyright ownership where she "selected, coordinated, and arranged in such a way" to render her work original. *Feist Publications v. Rural Tel. Serv.,* 499 U.S. 340, 358 (1991) (cleaned up). Again, however, these *legal* principles must be applied to *facts*, and the mere title of lead writer and editor is not dispositive. As explained earlier, Miller's contention that there is only a 0.98% overlap between the materials provided to her by Butter Book and the final copyrighted

14

glossary of terms, Pl.'s Reply at 11 (citing Exh. A), is not fully supported or explained by the offered exhibits. The jury will have to decide whether Butter Book was a joint author of the Works.

### C. Copyright Infringement (Count 3): Actual Controversy

Both parties move for summary judgment on Miller's claim of copyright infringement. Miller argues there is definitive evidence of Butter Book's infringement. Pl.'s Reply at 15. Butter Book argues that Miller is improperly seeking an advisory opinion because no act of actual or threatened infringement has occurred. Defs.' Br. at 10. Yet again the motions are denied on both sides.

The Copyright Act confers on the owner of a copyright the exclusive rights to reproduce the work, to prepare derivative works based upon it, and to display the copyrighted work publicly. 17 U.S.C. §§ 106(1), (2), (5). In order to prevail on a claim of copyright infringement, a plaintiff must establish: "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Janky v. Lake Cty. Convention and Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009) (quoting *Feist Publications*, 499 U.S. at 361). Put another way, a work is copyrightable if it possesses a "modicum of creativity." *Feist Publications*, 499 U.S. at 346.

To begin, Butter Book asserts that Miller fails to show that there is "any act of actual or threatened infringement in Count III." Defs.' Br. at 10. Butter Book contends that no evidence shows that it is currently using, or has threatened to use, the Works. *Id*. at 11. Given this very litigation, however, it is plain that Butter Book asserts licensing rights—and, indeed, even ownership rights—in the Works. *See*

15

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (explaining that whether an actual controversy exists depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (cleaned up)). Miller asserts, for example, that when she raised the issue of licensing in April 2018, she had not yet provided Butter Book with the copyrighted works, Pl.'s Resp. DSOF ¶ 85; and Butter Book expressed intention to publicly display at least some of the Works on their website, *id.* ¶ 55. What's more, even the threat to sue for copyright infringement is a significant fact in considering whether there is "an actual rather than merely a potential controversy." *See Klinger v. Conan Doyle Est., Ltd.*, 755 F.3d 496, 499 (7th Cir. 2014). Butter Book's myriad assertions of rights in the Works, whether by license or outright ownership, make it plain that the parties are mired in an actual controversy. The copyright-infringement claim is ripe and thus survives.

### D. Fraudulent Inducement or Concealment (Counts 4 and 5)

Butter Book next targets Miller's fraudulent inducement and fraudulent concealment claims. According to Butter Book, no reasonable jury could find that (1) Butter Book knew or attempted to conceal at the time it hired Miller that it would not offer her employment; (2) Butter Book intended to make or conceal statements about this fact so Miller would continue providing services; and (3) Butter Book owed Miller a duty to disclose its ability to employ her and to discuss copyright ownership of the Works with her. Defs.' Br. at 12–15. In response, Miller asserts that Butter

16

Book promised her employment and she would not have provided the services at the rates she worked for if this was not true. Pl.'s Br. at 10–14. Even when viewed in Miller's favor, the record evidence does not support the fraud claims.

In order to establish fraudulent inducement, Miller must show that (a) Butter Book made a representation of material fact; (b) Butter Book knew that the representation was false when made; (c) Butter Book had the purpose of inducing Miller to act; and (d) Miller reasonably relied on the representation to her detriment. *Lewis v. School Dist. #70*, 648 F.3d 484, 487 (7th Cir. 2011). Under Illinois law, fraudulent concealment (as distinct from inducement) "requires a plaintiff to allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (cleaned up). "The duty to disclose only arises in certain situations, including where the plaintiff and defendant are in a fiduciary or confidential relationship and where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Id.* (cleaned up).

Central to Miller's claims are Butter Book's alleged statements—as characterized in Miller's Local Rule 56.1 response Statement—that "[Miller] would be hired as a full-time employee," Pl.'s Resp. DSOF ¶ 61. There are several problems with this argument. First, to the extent that Miller is relying on a *promise* of *future* action made by Butter Book—rather than a statement of then-existing *fact*—generally speaking, "Illinois does not recognize a cause for promissory fraud." *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d 853, 865 (7th Cir. 2013).

17

It is true that there is an Illinois-recognized form of fraud for promises if the plaintiff can "allege and then prove that, at the time the promise was made, the defendant did not intend to fulfill it." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012) (cleaned up). Typically, a plaintiff relying on this theory would offer "a pattern of fraudulent statements, or one particularly egregious fraudulent statement." *Id* (cleaned up). There is no record evidence, however, that Butter Book's actions were embedded in a larger pattern of deception to trick Miller. Indeed, when it comes down to it, Butter Book actually never *promised* Miller future employment. DSOF ¶ 69. A careful examination of the record bears this out. Miller cites only statements of vague intention and hopes, not any concrete promise of future actions. *See* R. 222-9, Pl.'s Exh. 8., Miller Dep. 94:15–18 ("Oh, I was told [by Butter Book] during that first meeting that eventually this would be—*hopefully* turn into a full-time, long-term relationship …."); 95:2–5 ("In person they *talked about* being hired full time. In the e-mail they *referenced* long term relationship in which you could—in which I could utilize pastry background and writing skills."); 273:3–7: ("But Sebastien said at the end of the meeting in regards to time frame to continue—we *discussed continuing to work as a freelancer* and I would be hired soon ….") (emphases added to all quotations). These statements are "skeletal and lacking in specifics," and thus cannot support a fraud claim. *JPMorgan Chase Bank, N.A.,* 707 F.3d 853 at 865; *see also People*

18

*ex rel. Peters v. Murphy–Knight*, 618 N.E.2d 459, 463 (Ill. 1993) ("Statements regarding future events are considered opinions, not statements of fact.")[4]

On fraudulent concealment, there was nothing to conceal: as just explained, Butter Book made no promise of future employment, so Butter Book cannot be said to have then concealed that they did not intend to offer her future employment. In any event, Miller offers no facts on which a reasonable jury could find a duty to disclose, such as a confidential or fiduciary relationship. *See Lillien v. Peak6 Invest.*, 417 F.3d 667, 672 (7th Cir. 2005).

In sum, there is no genuine issue of material fact on the fraud claims, and those two claims are dismissed with prejudice.

### E. Promissory Estoppel (Count 6)

The same fate awaits Miller's promissory estoppel claim. To prove a promissory estoppel claim, Miller must show that (1) Butter Book made an unambiguous promise to her; (2) she relied on that promise; (3) her reliance was expected and foreseeable by Butter Book; and (4) she relied on the promise to her detriment. *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523–24 (Ill. 2009) (cleaned up).

As already discussed, however, Miller fails to offer record evidence of statements that qualify as unambiguous for purposes of promissory estoppel. Miller can

---

[4]To the extent that Miller offers Butter Book's special knowledge about the company's financial status as a basis for the fraud claim, *see Lillien v. Peak6 Invs., L.P.*, 417 F.3d 667, 671 (7th Cir. 2005), Miller provides no evidence that Butter Book withheld information about her potential employment or the delay of the website's launch. DSOF ¶ 23; DSOF ¶¶ 81–82.

only point to statements with prefatory, aspirational, or conditional language about her hoped-for future employment (e.g., statements using "hopefully," "talked about," "referenced," and "discussed"). Pl.'s Exh. 8., Miller Dep. 94:15—18; 95:2—5; 273:3—7. Even the most definitive statement in the record is a vague reference to her "continuing to work as a freelancer" before being hired in the future. *Id.* at 273:3–7. Consequently, the statements do not evidence a "clear, definite[,] and unequivocal" promise. *Phillips v. Britton*, 516 N.E.2d 692, 700 (Ill. Ct App. 1987). The promissory estoppel claim is dismissed as well.

## IV. Conclusion

Both sides' summary judgment motions on the copyright-infringement claims and the implied-license defense are denied, as is Miller's claim of copyright ownership over the disputed works. But Butter Book's motion is granted against Miller's fraudulent inducement, fraudulent concealment, and promissory estoppel. With this Opinion in place, the parties shall restart settlement negotiations and file a status report on them (including whether they want a settlement referral to the magistrate judge) by December 17, 2021. The tracking status hearing of November 26, 2021, is reset to December 23, 2021, at 8:30 a.m., but to track the case only (no appearance is required).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 23, 2021